# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | | |
|---|---|---|
| SCOTTSDALE INDEMNITY COMPANY, | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| v. | ] | **CV-12-BE-2146-S** |
| | ] | |
| MARTINEZ, INC., | ] | |
| | ] | |
| **Defendant** | ] | |
| | ] | |
| | ] | |

## <u>MEMORANDUM OPINION</u>

This insurance coverage dispute requesting a declaratory judgment is before the court on

Plaintiff "Scottsdale Indemnity Company's Motion for Summary Judgment."  (Doc. 41).

Defendant Martinez, Inc. d/b/a Martinez Building Services ("MBS") filed a response (doc. 46),

and Plaintiff Scottsdale replied (doc. 47); this motion has received thorough briefing.

For the reasons stated in this Memorandum Opinion, the court FINDS that the motion is

due to be GRANTED IN PART and DEEMED MOOT IN PART.  More specifically, the court

will GRANT the motion to the extent that it requests the following declarations: as to the request

in Count I—that MBS's claim is not covered under the terms of the insurance Policy because of

false statements in the Policy application; as to the request in Count II—that general agency

principles impute knowledge of the fraud to MBS and do not estop Scottsdale from enforcing the

Policy provisions to cut off coverage; and, as the the request in Count III—as an alternative

ruling, that MBS's claim is not covered under the terms of the insurance Policy because

1

discovery of the claim occurred before the inception of the Policy.  Further, the court will

GRANT Scottdale's motion as to the breach of contract claim set forth in Count II of MBS's

Counterclaim.  To the extent that Scottsdale requests that the court make other declarations, the

court DEEMS those requests to be MOOT.

## I.  PROCEDURAL HISTORY

On June 12, 2012, Plaintiff Scottsdale filed this lawsuit for a declaratory judgment that no

coverage exists for Defendant MBS's losses under the policy in question.  The Complaint

contains the following counts: Count I - declaratory judgment that MBS's claim is not covered

under the terms of the Insurance Policy because of false statements in the Policy application;

Count II - declaratory judgment that general agency principles impute knowledge of the fraud to

MBS; and Count III - declaratory judgment that MBS's claim is not covered under the terms of

the Policy because discovery occurred before inception of the policy because of  Walter's

knowledge of her own dishonest acts.

On July 25, 2012, MBS filed an Answer and Counterclaim (doc. 12), amended on

September 4, 2012 (doc. 18)  with the following Counts:   Count I - bad faith refusal to pay the

MBS claim under the policy with Scottsdale; and Count II - breach of contract in failing to pay

the MBS claim under the policy with Scottsdale.  Scottsdale filed a motion to dismiss Count I of

the Amended Counterclaim  (doc. 19), which the court denied (doc. 30).  However, on

September 4, 2013, MBS filed a "Voluntary Motion for Partial Dismissal," requesting dismissal

of its claim for bad faith (doc. 39); the court granted the motion, dismissing that claim in Count I

of the Amended Counterclaim (doc. 40).

On September 6, 2013, Scottsdale filed the motion for summary judgment addressed here,

requesting a declaration that MBS's claims were not covered as well as a dismissal of MBS's breach of contract Counterclaim.

## II. FACTS

MBS is a maintenance company servicing commercial properties, and, since the company's inception, Greg Martinez has served as its President.   From August 27, 2004 until her discharge in August of  2011, MBS employed Brenda Walters in a position with changing titles, from controller to CFO to CFO/CEO.   Regardless of the title of her position, she had the same essential duties: handling the company's financial accounting, office management, and day-to-day operations.   Martinez testified that Walters made the "minor decision-making," handled some contracts, and hired non-managerial office staff, whereas Martinez handled major decisions such as "putting numbers" on a large contract, purchasing a piece of equipment, and hiring managerial staff.   During the time period that Walters held the positions of CFO and combined CFO/CEO, Walters and Martinez were the only officers of MBS.

Between 2006 and August of 2011, MBS retained CPA Ben Bowen to prepare its income tax returns.   After MBS hired Walters in 2004, MBS never engaged Bowen to perform audits or prepare audit reports—and he did not actually do so—and Bowen never examined the books nor MBS's petty cash account.   After Walters was hired,  Bowen did not personally verify the accuracy of the MBS's bank balances and did not perform a financial review of MBS; he merely reviewed the information that MBS provided to him via Walters for tax return preparation to ensure that the bank reconciliations existed and "that the math worked on [them]."  (Doc. 43-14, at 6, p. 19).  Indeed, in its responsive brief, MBS admits that it "did not have a complete verification of all securities and bank balances performed. . .." (Doc. 46, at 17).  Bowen testified

3

that an audit—which he did not perform from 2004 onwards—would involve, among other things, an examination of the petty cash account to see how it was used, an examination of the employees' use of business credit cards, a review of its accounts payable with vendors and of separation of cash-handling duties, and a review and verification of MBS's balance sheet accounts by going through the general ledger and ensuring that every number on the balance sheet was accurate.

MBS employee Jennifer Smith, who served as Walters's assistant, testified that she performed account reconciliations beginning sometime prior to December of 2008 through September of 2010; she went on maternity leave on October 1, 2010, and did not resume performing bank account reconciliations when she returned.  During that period when Smith performed such reconciliation responsibilities, Walters also reconciled MBS's bank accounts, and Smith testified that Walters, who had Smith's password, went behind Smith and made changes to Smith's reconciliations that frequently reflected incorrect amounts.  From 2006 through her discharge in 2011, Walters also had authority to make withdrawals from and deposits into MBS's bank accounts.

On June 16, 2009 and then again on May 28, 2010, on behalf of MBS, Walters signed a "RENEWAL Application for Business and Management (BAM) Indemnity Insurance" for insurance with Scottsdale.  Explaining his involvement with MBS's insurance matters, Greg Martinez testified that he discussed insurance expenses with Walters but he was not himself involved in the effort of applying for and obtaining the insurance; he entrusted those application and procurement details to Walters.  No evidence exists that Greg Martinez communicated with Scottsdale or Scottsdale's agent concerning the insurance Policy in question or the application for

the Policy.

On the 2010 application, Walters listed her title as "CEO."  (Doc. 43-4, at 5).  The application's "Instructions for Completing This Application," states that "[t]he Application must be signed by an executive officer."  (Doc. 43-4, at 2).  The reason for this requirement is to ensure that the person signing would have full access to, and knowledge of, the insured's operation, and would have authority to bind the insured.  (Doc. 43-2, at 4-5; 43-4, at 2).

The information Walters provided in both the 2009 and 2010 applications includes the following under "Crime Coverage Section Information," checking "yes" to both questions below:

3.  Is there an annual audit or review performed by an independent CPA on the books and accounts, including a complete verification of all securities and bank balances?   ■ Yes   ☐ No

4.  Are bank accounts reconciled by someone not authorized to deposit or withdraw from those accounts?   ■ Yes   ☐ No

Above the signature, the application also includes statements that the information provided is true, that the application would become incorporated into the Policy, and that, in the event any misstatement exists in the application, the Insurer has "the right to exclude from coverage any claim based upon, arising out of or in connection with such misstatement or untruth."  (Doc. 43-4, at 9; 43-6, at 4, 7-8).   In submitting the 2010 application, MBS requested an increase in policy limits from $500,000 to $1,000,000 in coverage.

Scottsdale accepted the 2009 and 2010 applications, and provided the insurance requested, including the increase to $1,000,000 in coverage for the Policy Period of September 15, 2010 to September 15, 2011.  More specifics about the language and coverage in the 2010-

2011 policy is provided below.   E-Risk, a general agent for Scottsdale, underwrote the policy

issued it to MBS.  The E-Risk underwriter for the 2010 renewal of MBS's policy was Michael

Kinsley, who used his discretion to increase the coverage of the 2010-2011 policy to $1,000,000

in coverage for no additional premium charge.

Paul Tomasi, President of E-Risk, testified that E-Risk relied on all the information MBS

provided in the 2010 application in underwriting the Policy and deciding its terms.  He further

testified that the answers to questions 3 and 4 of the Crime Coverage Section were "extremely

important in assessing the crime risk to be assumed by the insurer because many, if not most,

employee theft losses involve employees who handle money and who have access to the

insured's receipts, checkbook or deposits."  (Doc. 43-2, at 7).  Tomasi explained that "the rating

formula followed by Scottsdale's underwriting policies, based on the rates filed with the

Alabama Department of Insurance, assigns a higher rating factor (and higher total premium) to a

policy where an insured responds 'no' to Questions 3 and/or 4."  Additionally, he stated that "no"

answers on these two questions "would have alerted the underwriter to the reality that MBS had

no independent accounting oversight of its accounting operations and/or did not separate account

reconciliation and withdrawal/deposit duties" and that E-Risk, as general agent for Scottsdale,

"would normally have charged an increased premium for the policy . . . ."  (Doc. 43-2, at 7-8).

On or around August 15, 2011,  Smith informed Greg Martinez that Walters had placed

Walters's boyfriend and daughter on MBS's business phone plan.  MBS immediately

commenced an investigation of Walters's activities, which revealed that Walters had embezzled

funds from MBS.  Of the $2,201,070.04 loss that MBS claimed as a result of Walters's allegedly

wrongful activities, over $1.3 million involved checks that Walters had signed made payable

6

either to cash, to herself, or to various MBS employees. The investigation also revealed that

Walters failed to pay MBS's payroll-withholding taxes for certain years, and failed to *file* MBS's

federal and state income tax returns that Bowen had prepared, and also failed to *file* Martinez's

personal federal and state income tax returns for the years 2007, 2008, 2009, 2010, and 2011 that

Bowen had prepared.  As a result of the revelations from the investigation, MBS terminated

Walters on August 29, 2011.

By written notice dated September 8, 2011, MBS notified Scottsdale that it had incurred a

loss as a result of "Employee theft of money, forgery, funds transfer fraud . . . ." (Doc. 44-3, at 4).

On January 4, 2012, MBS submitted to Scottsdale its  "Proof of Loss," signed and verified by

Gregory L. Martinez, President of Martinez, Inc., making a claim for the loss of $2,201,070.04

"occurring through the dishonesty of Brenda Walters employed as CEO/CFO ...  between 2006

and August 2011, and discovered on August 15, 2011." (Doc. 44-1, at 2).

By letter dated June 12, 2012, Scottsdale notified MBS that the loss was not covered

because (a) Walters had made material misrepresentations in the application; and (b) Walters had

known of her own fraudulent actions prior to the 2010-2011 policy's inception.

The 2010-2011 Policy

Scottsdale issued to MBS a renewal Business Management and Indemnity Liability

Policy, Policy No. EKI 3024660, with a policy period of September 15, 2010 to September 15,

2011.  In the section marked "GENERAL TERMS AND CONDITIONS," the Policy includes the

following relevant language:

B.  DEFINITIONS

1.  **Application** means all applications, including any attachments thereto, and all

other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** underwriting this **Policy** is a renewal or replacement.  All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy.**
\*\*\*

D.  WARRANTY
It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy,** the **Insureds** agree that:

    1.  the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy,** and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

    2.  In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this Policy, this **Policy,** including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:
        \*\*\*

        c.  any **Company, Sponsor Company, Plan, Employee Benefit Plan,** or any other entity that is an **Insured,** if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the **Parent Company** knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy.**[1]

(Doc. 43-3, at 8, 9-10, & 59).

---

[1] This section, "D. WARRANTY, subsection 2" was changed from a former version to this provision by an endorsement effective September 15, 2010.  Scottsdale's brief does not quote this amended provision but refers in footnotes 41, 43-44, 69, & 81 to the page in the evidentiary material containing the *unamended* section D.2.  The court is unsure whether this error was a citing error or whether counsel was unaware of the amendment.

This Policy includes a Commercial Crime Coverage Section, which provides coverage for certain instances of employee theft.  It states in relevant part as follows.

A.  INSURING CLAUSES
    1.  Employee Theft Coverage
        a.  Employee Theft
        The Insurer will pay for loss of or damage to **Money, Securities** and **Other Property** resulting directly from **Theft** or **Forgery** by any identifiable **Employee** while acting alone or in collusion with others.

B.  DEFINITIONS
    ***
    4.  **Employee** means:
        a.  Any natural person while in the service of the Insured, including sixty (60) days after termination of service; provided the Insured:
            i.  compensates such person directly by salary, wages, or commissions; and
            ii.  Has the right to direct and control such person while performing services for the **Insured**;
    ***
    10.  **Insured** means the **Company** and any **Employee Benefit Plan.**
    ***
    12.  **Money** means:
        a.  currency, bullion, coins and bank notes; and
        b.  travelers checks, register checks and money orders held for sale to the public.
    13.  **Other Property** means any tangible property other than Money and Securities that has intrinsic value but does not include any property excluded under this Crime Coverage Section.
    ***
    19.  **Theft** means the unlawful taking of **Money, Securities,** or **Other Property** from the **Insured.** . . .

C.  EXCLUSIONS
    The Insurer will not pay for:
    ****
    7.  Loss resulting from any dishonest or criminal act committed by any of the **Insured's Employees,** directors or trustees whether acting alone or in collusion with others and whether committed while performing services for the Insured or otherwise, except to the extent coverage is afforded under Insuring Clause 1.

D.  OTHER CONDITIONS
2.  Discovery
The Insurer will pay for loss sustained by the Insured through acts committed or events occurring at any time and discovered by the **Insured** during the **Policy Period.**  Discovery of loss occurs when an officer, director, Insurance Manager or Risk Manager first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this Crime Coverage Section has been or will be incurred, even though the exact amount or details of such loss may not then be known.  Discovery also occurs when the **Insured** receives notice of an actual or a potential claim against it alleging facts that, if true, would constitute a covered loss under this Crime Coverage Section.
***
5.  Termination of this Coverage Section
This Crime Coverage Section shall terminate as to any **Employee** from and after the time that the **Insured** or any officer or director thereof not in collusion with such **Employee** shall have knowledge or information that such **Employee** has committed any fraudulent or dishonest act in the service of the **Insured** or otherwise, whether such act be committed before or after the date of employment by the **Insured.**

(Doc. 43-3, at 36-39).

### III.  STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) Substantive law determines which facts are material and which are irrelevant. *Id*. at 248. In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."). "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on

his pleadings." *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999)

(citing *Celotex,* 477 U.S. at 324). If he does, or if the evidence is "merely colorable, or is not

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50

(citations omitted). In reviewing the evidence submitted, the court must "view the evidence

presented through the prism of the substantive evidentiary burden," to determine whether the

nonmoving party presented sufficient evidence on which a jury could reasonably find for the

nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575

(11th Cir. 1988). The court must refrain from weighing the evidence and making credibility

determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S.

at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v.

State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and

inferences drawn from the underlying facts must be viewed in the light most favorable to the

non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the

benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-

moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."

*Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment,

the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party

is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful

veracity, it is not proper to grant summary judgment on the basis of credibility choices.'"

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v.

Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving

statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## IV.  DISCUSSION

In its brief supporting the motion for summary judgment, Scottsdale makes various arguments that no coverage exists under the policy in question and that the court should so declare.  The parties begin their arguments by pointing to general agency law and Alabama statutory law, and eventually referencing the following policy provisions: (1) GENERAL TERMS AND CONDITIONS, section D. WARRANTY, subsection 2. (and incorporating the Application into the policy contract); (2) CRIME COVERAGE SECTION, section D. OTHER CONDITIONS, subsection 2. Discovery; and (3) CRIME COVERAGE SECTION, section D. OTHER CONDITIONS, subsection 5. Termination as to any Employee.

### A.  Lack of Coverage - Misrepresentations in the Application

Most of Scottsdale's arguments asserting lack of coverage focus on imputing knowledge of its officer's misconduct to MBS as the principal and contracting party.   MBS is a corporation, and, thus, must do business through agents and must receive notice of wrongdoing through agents.  Here, the question of Walters's agency for her principal, MBS, becomes complicated because Walters not only is the agent committing fraud against her principal, but also is the agent procuring insurance on behalf of  her principal to protect it from fraud.  Scottsdale argues Walters's knowledge that she had committed fraud and that she was submitting incorrect answers to the insurance application questions is imputed to MBS, her principal, and Scottsdale is not liable to MBS under the resulting insurance contract.

13

MBS argues, on the other hand, that Walters was acting adversely to the company's interest when she committed the fraud and submitted incorrect answers to application questions to discourage its discovery, and thus, her actions and knowledge are not imputed to the principal. To add a layer of complexity to the argument, MBS does not want to disavow *all* of Walters's actions.  Rather, it presents an "I want to have my cake and to eat it, too" argument.  On one hand, MBS asserts its right to the protections and proceeds of an insurance policy for which Walters applied on behalf of MBS, Scottsdale's acceptance of which at the rate provided was based in part on Walters's untruthful answers.  On the other hand, MBS asserts its right to disavow knowledge of her incorrect answers and her fraud against which the insurance protects.

Given that the insurance contract between the parties includes provisions addressing misrepresentations in the contract, and specifying what misrepresentations and whose knowledge of the misrepresentations cut off coverage, the court first turns to the insurance contract itself.

*GENERAL TERMS AND CONDITIONS, Section D, WARRANTY, subsections 1 & 2*

Under the policy's "GENERAL TERMS AND CONDITIONS," section D.2., as amended effective on September 15, 2010, the first date of the relevant Policy Period, the Policy states specifically when misrepresentations in the application bar coverage;  not all misrepresentations will affect coverage for a particular claim.  The relevant language, quoted in the fact section of this opinion, specifies the circumstances under which it may bar coverage based on misrepresentations in the application:   it will *not* cover claims brought under a policy (1) when misrepresentations occur in the application for that policy; (2) that either  (a) are made with intent to deceive *or* (b) are material to the acceptance of the risk; *and* (3) that are "in any way involving" the claim made under the policy; *and* (4) that are brought by certain categories of

14

Insureds.  The court will determine whether, under the evidence, Scottsdale has proven that this provision applies to bar coverage.

1.  Misrepresentations in the Application

The court finds that Walters made at least two misrepresentations on the 2010 application for the 2010-2011 Policy made the basis of this suit.  As Scottsdale points out in its brief, Walters answered  "yes" to the following two application questions:

3.  Is there an annual audit or review performed by an independent CPA on the books and accounts, including a complete verification of all securities and bank balances?

4.  Are bank accounts reconciled by someone not authorized to deposit or withdraw from those accounts?

(Doc. 43-6, at 8).

The  evidence reflects that, after hiring Walters, MBS hired one independent CPA, Ben Bowen, to prepare annual tax forms but that Bowen did not audit  MBS's books and accounts. Although MBS claims that Bowen performed an annual review, it acknowledges in its responsive brief that any review he performed did not include a complete verification of all securities and bank balances.   Therefore, no genuine dispute exists that the answer Walters provided to question three was wrong.

Further, the evidence reflects that, as of the 2010 application date, Walters's assistant Jennifer Smith performed MBS's account reconciliations.  Contrary to MBS's arguments, the evidence reflects that Walters, who was authorized to deposit or withdraw from those accounts, also reconciled MBS's bank accounts, and actually made changes to Smith's reconciliations to reflect incorrect totals.  Thus, the evidence reflects that the answer Walters provided to question four was wrong, and the court FINDS that the evidence establishes these two application answers

15

are misrepresentations.

2. Intent to Deceive/Materiality

Having determined that misrepresentations existed on the application, the court must next determine whether the evidence supports the provision's requirements that the misrepresentations either be made with intent to deceive or be material.

a. Intent to Deceive

"The question of intent is commonly one for the jury, where it does not follow as a clear deduction from undisputed facts. . . ." *Woolsey v. Jones,* 4 So. 190, 192 (Ala. 1988). Conversely, when intent follows as a clear deduction from undisputed facts, then the issue is appropriately decided by the court as a question of law. *See id.*

Walters was the officer handling the company's financial accounting. As the officer working with and supplying information to CPA Bowen, she was fully aware of what services he was asked to perform and what he actually performed. Further, she was fully aware of what information she provided to him as he performed those duties. MBS was a small company, and no layers of separation existed between the CEO/CFO and the CPA hired to do the taxes. Accordingly, Walters knew that Bowen did not perform the services as she represented on the 2010 application; she knew her answer to question 3 was incorrect. She also knew that her answer to question 4 was incorrect, because it asked whether a different person controlled balancing the bank accounts from the person with authority to deposit and withdraw from those same accounts, and the undisputed facts show that she ultimately controlled both functions on those accounts.

No dispute exists that Walters was stealing from the company before she filled out the

16

2010 application, so Walters had a motive to conceal the correct answers: the desire to obtain insurance and to avoid the insurance company's inquiries into safeguards that would expose her theft.

Given these facts and the logical deductions from them, no reasonable jury could find that Walters did not have an intent to deceive when she provided incorrect answers to questions 3 and 4; the court FINDS that the evidence establishes as a matter of law that Walters provided those answers with an intent to deceive.

> b.  Materiality

The same provision includes an alternative clause to the "intent to deceive" phrasing; it also cuts off coverage in certain circumstances where the application "contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**...."  (Doc. 43-3, at 59).  A fact is material if it increases the risk of loss to the insurer and would have induced a rational underwriter to either reject the application or accept it only at an increased premium.  *See* 9 Couch on Insurance § 38:27 (2nd ed. 1962) (Supp. 1983); *see also Clark v. Ala. Farm Bureau Mut. Cas. Ins. Co.,* 465 So. 2d 1135, 1139 (Ala. Civ. App. 1984) (quoting with approval that provision of Couch on Insurance).

As noted in the fact section of this opinion under "GENERAL TERMS AND CONDITIONS," section D. WARRANTY, subsection 1. , the Policy specifically provides that the statements in the application are "representations [that] shall be deemed material to the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy** ...."  (Doc. 43-3, at 9).

17

Further, in his affidavit, Tomasi of E-Risk, the general agent for Scottsdale, stated that Scottsdale's underwriting policies assign a higher rating factor and higher total premium where an insured answers "no" to questions 3 and 4.  He explained that the answers to those questions are "extremely important in assessing the crime risk to be assumed" because "internal accounting controls" and "independent oversight ... directly bears on the potential exposure to loss faced by the insurer."  Thus, he explained that E-Risk as general agent for Scottsdale would have normally charged an increased premium for the policy in question had Walters provided correct answers. This evidence reflects that the answers to the questions at issue were material to the risk that Scottsdale assumed, i.e., theft and other crimes by MBS's employees, including Walters.

MBS argues that contradictory evidence exists from Scottsdale's corporate representative, but the court finds no contradiction.  MBS seems to rely on a strained "contradiction" to argue that the answers to questions 3 and 4 were not material because the  underwriter would normally have accepted the application, albeit at a greater premium, even if those questions received a correct "no" responses. If MBS is arguing that materiality hinges only on whether the application is accepted or declined outright, the court rejects that argument; a fact is material if it increases the risk of loss to the insurer and would have induced a rational underwriter to accept the risk only at an increased premium.  *See Clark,* 465 So. 2d at 1139; *see also* policy provision deeming those statements to be material, Doc. 43-3, at 9.

 Based on the insurance contract itself and the evidence submitted, the court FINDS that the misrepresentations in the answers to questions 3 and 4 were material to the acceptance of the risk or the hazard assumed by Scottsdale.  Indeed, if MBS had in place a complete independent audit and bank reconciliation independent of Walters, her scheme would not have been

18

successful for as long as it was.

3. Requisite Relationship between the Misrepresentation and the Claim

Having determined that CEO Walters's misrepresentations on the application were made with intent to deceive and were material, the court must next determine whether the claim MBS presented pursuant to its policy had the requisite relationship with the identified misrepresentations to terminate coverage. The provision requires that, for the misrepresentation to cut off coverage, the claim must be "based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving" the "untruthful or inaccurate statements" on the application. Because of the "or" clauses, the court need only apply the least specific of the alternatives: the requirement that the claim was "in any way involving" the misrepresentations on the application. The court need not prepare extensive analysis on this issue; the questions highlighted above were designed to allow the insurance company to determine whether the company had checks and balances so that fraud, embezzlement, and other theft on the part of employees and officers would be discovered during account reconciliations and annual reviews. Walters was engaging in the very misconduct that the checks and balances were designed to prevent, and her false answers allowed her misconduct to continue, covering up the lack of checks and balances and preventing inquiries from the insurance company that might result in the institution of effective checks and balances. Because of the breadth of the language—"in any way involving"—the court concludes that the claims in the instant case do indeed meet that requirement.

4. List of Insureds Not Covered

Having found that the misrepresentations on the application were material and made with

19

intent to deceive, and that the claim had the requisite connection with those misrepresentations, the court has one remaining task before it can find that the provision applies to bar coverage: it must determine whether MBS falls within the list of Insureds against whom the insurer can deny coverage if all the other requirements of the provision are met.  Included in that list is  "any **Company** ... that is an **Insured,** *if any* past or present chief executive officer, chief financial officer ... knew the facts misrepresented or the omissions ...."  (Doc. 43-3, at 59) (emphasis added).   In other words, the insurance contract between Scottsdale and MBS specifically sets out when company officials' knowledge will bar the company's coverage.

In the instant case, Walters, who provided the answers to the application questions, was CEO of MBS at the time of the application.  Thus, by the insurance contract's very terms, MBS is not covered if the other specified requirements apply—which they do—and if Walters knew the facts misrepresented—which she did.  By the contract's very terms, coverage is barred because of CEO Walters's knowledge of the facts misrepresented regardless of whether Greg Martinez had such knowledge.   Accordingly, the court FINDS that MBS is *not* covered for the claims in this lawsuit.

The court notes that the briefs in this case refer to Section 27-14-7 of the Alabama Code entitled "Representations in applications."  That section provides in relevant part as follows:

Misrepresentations ... and incorrect statements shall not prevent a recovery under the policy or contract unless either:
    (1) Fraudulent;
    (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
    (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the

> loss if the true facts had been made known to the insurer as required either by
> the application for the policy or contract or otherwise.

Ala. Code § 27-14-7 (1975).  The court finds that the Policy provision in question is consistent

with the Alabama Code section.  As discussed above, the Policy provides that misrepresentations

in the application will not prevent coverage under the policy unless they are made with intent to

deceive *or* are material to the acceptance of the risk assumed, and the court has found that both of

those elements are met in the current case.

Therefore, the court WILL GRANT the motion for summary judgment as to the claims in

Count I of the Complaint for Declaratory Judgment to this extent: the court WILL DECLARE

that MBS is not covered for the claims in this lawsuit because MBS and its claim fall within the

provisions of the relevant Policy's GENERAL TERMS AND CONDITIONS, Section D,

WARRANTY, subsection 2; and that Scottsdale is entitled to a judgment in its favor and against

MBS on that issue.

In light of the rulings above, the court further FINDS that Scottsdale motion for summary

judgment is due to be granted as to Count II of the Counterclaim, in which MBS asserts that

Scottsdale has breached the contract of insurance by failing to pay the claim in question;

summary judgment is due to be entered on the claim in favor of Plaintiff/Counter-Defendant

Scottsdale and against Defendant/Counter-Plaintiff MBS.

### B.  Lack of Coverage  - Commercial Crime Coverage Section, Discovery provision

Scottsdale also asks for a declaration that MBS's claims are not covered because MBS

"discovered" the loss prior to the Policy Period pursuant to the discovery provision of the

Commercial Crime Coverage Section in the Policy.  Given the court's previous ruling that the

21

Insured is not covered for the claim in question, this ruling is an alternative one.

The Commercial Crime Coverage section contains its own provision about discovery and imputation of an agent's knowledge to the principal.  That provision, quoted more fully in the facts above, states as follows: "The Insurer will pay for loss sustained by the Insured through acts committed or events occurring at any time and discovered by the **Insured** during the **Policy Period.**  Discovery of loss occurs when an officer, director, Insurance Manager or Risk Manager first becomes aware of facts which would cause a reasonable person to assume that a loss covered by this Crime Coverage Section has been or will be incurred ...."  (Doc. 43-3 at 41).

In the instant case, the Policy Period was September 15, 2010 through September 15, 2011.  The undisputed facts reflect that Walters, an officer of MBS, was aware before September 15, 2010 that she had stolen from MBS and committed other misconduct causing loss to MBS that would normally fall under the Commercial Crime Coverage Section's Insuring Clause.  A reasonable CEO would have known that her theft, misappropriation and embezzlement from her employer resulted and would continue to result in loss to her employer.    Thus, regardless of whether Greg Martinez was yet aware of the loss before September 15, 2010, the "Discovery" provision meant that Walters's knowledge of that loss before September 15, 2010 was imputed to the company.  Accordingly, based on this "Discovery" provision, discovery occurred *before* the Policy Period, but the policy will only pay for loss discovered *during* the Policy Period.  Thus, as an alternative finding, even *if* MBS is an Insured covered by the policy, the loss asserted is not covered because, based on the "Discovery" provision of the Commercial Crime Section, the Insured "discovered" it before the Policy Period.

**C.  Count II and General Principles of Agency Law**

The parties make other arguments addressing the imputation of knowledge from agent to principal under general agency law, and the applicability of the "adverse interest" rule, the "sole representative" doctrine, the equitable doctrine of estoppel, etc.  MBS argues that even if the Policy provisions call for the imputation of Walters's knowledge of her misrepresentations and other misconduct to MBS, Scottsdale is estopped under general agency principles from doing so because her actions were adverse to MBS's.

The court is not convinced that general agency principles come into play when Walters was an officer of the company purchasing the insurance Policy, when the Policy's unambiguous provisions provide the circumstances under which her knowledge is imputed to the company to cut off coverage, and where that Policy provision complies with Alabama statutory law.   Further, the court notes that the case upon which both parties rely to discuss the sole representative doctrine under Alabama law is an elderly case dating back to 1915 regarding a fraudulent scheme to defraud a bank on *a promissory note*, not—as here—an insurance contract with a crime coverage section that specifies when an employee's knowledge of the crime is imputed to the company to prevent coverage.  To the extent, if any, that general agency principles apply*,* the court finds that general agency principles would not change its conclusion that no coverage exists for this claim.

Both parties agree that if the agent is the sole representative of the principal in a transaction with a third party, then her acts and knowledge are imputed to the principal regarding that transaction *even if she is acting adversely to the principal*.  *See Tatum v. Commercial Bank & Trust Co.,* 193 Ala. 120, 69 So. 508, 512 (1915) (stating "[i]f the agent or officer who has

notice or knowledge of the extrinsic fact is the sole person or agency by which the corporation is represented in the matter, this notice to or knowledge of such agent or officer must of necessity be notice to or knowledge of the corporation. . . .This forms a limitation upon ... the exception to the rule that a corporation is not chargeable with, or bound by, notice to or knowledge of its agent or officer, when he is acting for himself, and not the corporation, or when he has an individual interest in the matter adverse to that of the corporation."); *see also* Def.'s Br. Doc. 46 at 14 (citing *Tatum* and acknowledging its finding that the adverse interest exception "does not apply if the 'agent' is the 'sole representative' of the principal with regard to a transaction.").   Thus, both parties acknowledge that *if* Walters is the sole representative of MBS regarding its insurance transaction with Scottsdale, then her knowledge is imputed to MBS.  The undisputed facts establish that neither Greg Martinez nor anyone else at MBS except Walters had any communication with E-Risk and Scottsdale regarding the policy in question until the loss occurred; from the point of view of E-Risk and Scottsdale, Walters was MBS's sole representative.

Given those facts, the court finds that Walters acted as MBS's sole representative regarding application for and the procurement of the 2010-2011 insurance policy.  The court WILL GRANT Scottsdale's motion for summary judgment to the extent that it requests the following declaration as to the claims in Count II of the Complaint for Declaratory Judgment: to the extent, if any that the sole representative doctrine even comes into play, the court FINDS and WILL DECLARE that, in the insurance transaction between MBS and Scottsdale regarding the application for and procurement of the 2010-2011 insurance policy,  MBS is chargeable with Walters's knowledge that she had been stealing from MBS and that she gave false information in

answering application questions 3 and 4 discussed above. The court further FINDS and WILL DECLARE that general agency principles do not estop Scottsdale from enforcing the Policy's provisions to cut off coverage based on Walters's knowledge of the misrepresentations in the application and of her own misconduct that was adverse to MBS.

### D.  Termination Clause

The court notes that the last Count in the Complaint for Declaratory Judgment, Scottsdale states that "[o]ther terms and conditions of the Policy may ultimately be implicated" and that "Scottsdale in no way waivers, and expressly and fully reserves, the right to rely on any other such provisions of the Policy."  (Doc. 1, at 10, ¶ 29).  In the briefs, the parties discuss the application of the "Termination Clause" of the policy.   The court need not and does not reach or address the application of the "Termination Clause" as yet another alternative ruling denying coverage, because the court has already found that MBS is not a covered Insured as coverage is defined by the contract in question, and the court has already made a separate alternative finding that the loss is not covered in any event under the "Discovery Clause."  Accordingly, to the extent that the motion for summary judgment and the Complaint for Declaratory Judgment request a declaration as to this claim or other unspecified claims, the court WILL DEEM those requests to be MOOT, and does not reach them.

### V.  CONCLUSION

In sum, for the reasons discussed above, the court FINDS that the motion for summary judgment is due to be GRANTED IN PART and DEEMED MOOT IN PART.  More specifically,

•     The court WILL GRANT the motion for summary judgment as to the claims in Count I of

the Complaint for Declaratory Judgment to this extent: the court WILL DECLARE:   (1)
MBS is not covered for the claims in this lawsuit because the claims fall within the
provisions of the relevant Policy's GENERAL TERMS AND CONDITIONS, Section D,
WARRANTY, subsection 2.c.; (2) no coverage exists for those claims because of MBS's
material, false statements in the Policy application made by Walters with intent to deceive
knowing the facts misrepresented; (3) the claims alleged by MBS under the Policy fall
within the language "alleging, based upon, arising out of, attributable to, directly or
indirectly resulting from, inconsequence of, or in any way involving" the facts
misrepresented in the Policy application; and (4) Scottsdale is entitled to a judgment in its
favor and against MBS on that issue.

- The court WILL GRANT Scottsdale's motion for summary judgment as to the claims in
Count II of the Complaint for Declaratory Judgment: to the extent, if any, that the sole
representative doctrine even comes into play, the court WILL DECLARE that, in the
insurance transaction between MBS and Scottsdale regarding the application for and
procurement of the 2010-2011 insurance policy,  MBS is chargeable with Walters's
knowledge that she had been stealing from MBS and that she gave false information in
answering application questions 3 and 4 in the Crime Coverage Section. The court further
WILL DECLARE that general agency principles do not estop Scottsdale from enforcing
the Policy's provisions to cut off coverage based on Walters's knowledge of the
misrepresentations in the application and of her own misconduct that was adverse to
MBS.

- As an alternative ruling, the court WILL GRANT the motion for summary as to the claim

in Count III of the Complaint for Declaratory Judgment to the following extent.  The

court WILL ENTER SUMMARY JUDGMENT in favor of Plaintiff Scottsdale and

against Defendant MBS, and WILL DECLARE: (1) discovery of the loss made the basis

of the claim occurred before the Policy Period pursuant to the Policy's CRIME

COVERAGE SECTION, section D. OTHER CONDITIONS, subsection 2. Discovery;

(2) no coverage exists for the claim in question; and (3) Scottsdale is entitled to a

judgment in its favor and against MBS on that issue.

- As to the claim for breach of contract set forth in Count II of the Counterclaim asserted by

  MBS against Scottsdale, the court WILL GRANT Scottsdale's motion for summary

  judgment, and WILL ENTER SUMMARY JUDGMENT in favor of Plaintiff/Counter-

  Defendant Scottsdale and against Defendant/Counter-Plaintiff MBS.

- To the extent that the motion for summary judgment and the Complaint for Declaratory

  Judgment request a declaration as to a claim brought under the "Termination Clause" of

  the insurance policy in question  or as to other unspecified claims, the court WILL DEEM

  those requests to be MOOT, and does not reach them.


Dated this 25th day of September, 2014.

*Karon O. Bowdre*

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE

27